**LAREDO MEDICAL GROUP CORPO-
RATION and Mercy Health System
of Texas, Inc., Appellants,**

v.

**Josefina B. MIRELES, Appellee.**

No. 04–03–00729–CV.

Court of Appeals of Texas,
San Antonio.

Oct. 20, 2004.

Rehearing Overruled Nov. 30, 2004.

Lynne Liberato, Felicity A. Fowler, Kent Rutter, Haynes and Boone, L.L.P., Houston, Donato D. Ramos, Law Office of Donato D. Ramos, Laredo, for appellants.

David H. Jones, Andres H. Gonzalez, Jr., Raymond L. Thomas, Kittleman, Thomas, Ramirez & Gonzales, P.L.L.C., McAllen, Vincent L. Marable, III., Paul Webb, P.C., Wharton, for appellee.

Sitting: PAUL W. GREEN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Pursuant to *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985), Josefina Mireles sued Laredo Medical Group Corporation and Mercy Health System of Texas, Inc. for allegedly firing her because she refused to perform an illegal act. The jury agreed, awarding Mireles more than $1.5 million. Appellants Laredo Medical Group and Mercy Health System bring nine issues on appeal. We reverse and remand pursuant to *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000).

### BACKGROUND

In 1995, a group of doctors practicing at Mercy Hospital in Laredo, Texas, discussed forming a single medical group which would attract new doctors to Lare-

do. Instead of starting a practice in Laredo, a new doctor could join this existing medical group and receive a guaranteed salary for three years. After three years, the physician would rely on his own collections for income, minus a percentage to be retained by the medical group to cover overhead expenses. The doctors presented their idea to Mercy Hospital, a tax-exempt, not-for-profit hospital that is part of the Sisters of Mercy Health System, a national Catholic healthcare system. Agreeing that the idea was a good one, in October 1995, the Sisters of Mercy Health System formed Mercy Health System of Texas, Inc. ("Mercy") to serve as the parent holding company of Mercy Hospital and Laredo Medical Group Corporation ("LMG"), a newly formed not-for-profit health corporation. Mercy was the sole corporate member of LMG, and its Chief Executive Officer served on LMG's board of directors as a nonvoting "corporate member." All of the voting members were doctors.

In November 1995, the LMG board voted to hire Josefina B. Mireles, a certified public accountant, as the Director of Finance for their medical group. Billings and collections were the responsibility of Mireles and her staff. In its first year, LMG's billings and collections were below national benchmarks. The board concluded that Mireles and her staff could not keep up with LMG's growth. The board decided to hire an outside firm, one with experience in establishing centralized billing infrastructures for medical groups, to help resolve the problem. In January 1997, Professional Healthcare Consultants ("PHC") and its president, Gina Volmert, began working with LMG on a consulting basis. PHC and Volmert helped LMG establish a central billing office and develop procedures for improving collections. As a result, LMG's collections improved.

Pleased with the results, LMG's board asked Volmert to assume the role of LMG's acting Chief Operating Officer ("COO"). LMG and PHC formalized their relationship with a five-year contract, which was approved by the board. Volmert remained president of PHC but also continued in her role as LMG's acting COO. Mireles was instructed that she would report to Volmert and that Volmert was her superior. Mireles remained responsible for LMG's payroll and accounts payable, but all responsibility for billings and collections was transferred to Volmert and PHC.

Mireles became concerned about Volmert's billing department's practices and reported these concerns to various superiors at LMG. In response, Mireles was told that these practices were not her concern; rather, they were the billing department's area. In December 1999, Mireles was fired. LMG and Mercy claim that Mireles was fired because of cost-cutting and downsizing concerns. Mireles believes that she was fired because she refused to perform an illegal act.

### SABINE PILOT CLAIM

In *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985), the supreme court held that public policy requires a very narrow exception to the employment-at-will doctrine. "That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Id.* The court further held that "in the trial of such a case it is the plaintiff's burden to prove by a preponderance of the evidence that his discharge was for no reason other than his refusal to perform an illegal act." *Id.*

According to LMG and Mercy, Mireles failed to prove a *Sabine Pilot* claim. Instead, LMG and Mercy argue that her

allegations, if taken as true, only state a whistleblower claim. And, there is no whistleblower cause of action against a private employer. *See City of Midland v. O'Bryant,* 18 S.W.3d 209, 215–16 (Tex. 2000) ("We declined to recognize a common-law whistleblower cause of action in *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723, 724–25 (Tex.1990), and reaffirmed our decision not to do so in *Austin v. HealthTrust, Inc.,* 967 S.W.2d 400 (Tex.1998).").

### A. Various Accounting and Billing Allegations

██ For there to be legally sufficient evidence of Mireles's *Sabine Pilot* claim, there must *be* evidence that (1) Mireles was ordered to perform an illegal act and (2) that she refused to do so. *See Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex. 2001) (in conducting legal sufficiency review, we consider only that evidence favorable to jury's decision and disregard all evidence and inferences to contrary). Mireles alleges in her brief various illegal acts by LMG and Mercy: violation of federal anti-kickback laws, violation of excess compensation laws, violation of laws prohibiting health care fraud, and unapplied credits which in turn, violate federal laws prohibiting excess compensation to physicians. The question, however, is not whether LMG and Mercy were performing illegal acts; the question instead is whether LMG and Mercy ordered Mireles to perform an illegal act and whether she refused to do so. With respect to the above allegations, we cannot find any evidence that Mireles was ordered to perform an illegal act or that she refused to do so.

Mireles argues that as a CPA and Director of Finance, she had an undisputed duty to prepare accurate reports and to not conceal illegal activity. According to Mireles, she "was told to prepare financial reports which were based on information which was not truthful." Mireles was concerned about various billing practices; these billing practices, however, were being conducted by LMG's billing department, headed by Volmert. Mireles's department, the accounting department, was not in charge of the billing. Mireles only used information supplied by Volmert's billing department to determine whether a particular doctor owed money to LMG (i.e. the doctor had drawn more money than billed and taken in) or whether the doctor was to receive money (i.e. the doctor had billed and taken in more money than he drew). When Mireles questioned certain billing practices, Jerald Sparenberg, her supervisor, told her that billing was not her job; it was Volmert's billing department's concern. Mireles was only to use the information given by the billing department.

When asked if anyone ordered her to commit illegal acts on behalf of her employer, Mireles testified to the following:

A: No, not in those words.

Q: Okay. Then—by the way, what sort of fraudulent and untruthful reports were you asked to prepare?

A: The reports that we produced at the accounting department were based on the information provided by the billing department. And some of that information was not truthful, and some of that information, in my opinion, was fraudulent.

Q: What is a physician productivity report?

A: A physician productivity report was a statement that we produced every month for all the practices in LMG, that included all their cash collections and their expenses.

Q: And are those physician productivity reports something—who is responsible for preparing the pro-

Q: ductivity—physician productivity reports?

A: The accounting department.

Q: That was your department.

A: It was my department.

Q: And using those physician productivity reports, what is the purpose of those?

A: Was to inform the physicians how the practice—their practices were doing, to inform management at LMG, the Board of Directors and Mercy how the practices were doing.

Q: And what are physician true-up reports?

A: Physician true-up reports were the calculations we would do every six months and twelve months to calculate whether there were any moneys or cash due to the physicians in excess of what they had drawn, or whether we had overpaid them and the physicians owed money back.

* * *

Q: The physician productivity reports that your department prepared and the physician true-up reports that your department prepared, where did the information you—the figures that you use, the information you use, where did it come from?

A: The collections came from the billing department.

Q: From over here, Ms. Gina Volmert's [department]?

A: Yes, sir.

Q: All right. And so what was your concern, then, when you were preparing these physician productivity reports and physician true-up reports? What was your concern?

A: Several areas in the billing department. The unapplied credits that

we talked about, the Stark law that was mentioned before, the double billings that were happening. All those excess collections were getting credited to the physicians in the productivity report and their true-up calculations. So once those moneys came in, the physicians were getting paid for them.

Q: Let me see if I can understand that. The double billing didn't come out of your accounting department, right?

A: No, sir.

Q: That was the responsibility of who[m]?

A: The billing department.

Q: The accumulation of unapplied credits, was that something that your department handled?

A: We handled the accounting side of it in the sense that we kept track of the amount of unapplieds. But the process in which those moneys were collected and refunded was the responsibility of the billing department.

This testimony is no evidence that Mireles was ordered to perform an illegal act. Looking at her testimony in the most favorable light, the alleged unlawful acts were happening in the billing department. All Mireles did was take the billing department's information and summarize them in reports that were used internally. There is simply no evidence that summarizing information for use in internal reports is illegal.

Second, even if there were evidence that Mireles was ordered to perform an illegal act, there is no evidence that she refused to do so. There is no evidence in the record that Mireles refused to prepare the internal accounting reports that contained the alleged fraudulent and untruthful in-

formation. Instead, the evidence shows that Mireles did, in fact, prepare these reports. Instead of refusing to prepare the reports, Mireles complained to her supervisors and others that she believed that there were problems in the billing department. In other words, Mireles did not refuse to do an illegal act; she only complained about alleged illegal acts committed in the billing department. This evidence is not sufficient to support a *Sabine Pilot* cause of action.

In her brief, Mireles claims that the evidence shows that she refused to commit an illegal act. For support, Mireles argues that she testified that she would not violate Medicare–Medicaid laws:

Q: And you don't—or you didn't personally, yourself, do anything that violated Medicare or Medicaid, did you?

A: In the context of me doing the double billing or the medical billing, no, I did not personally do any of these things.

Instead of showing that Mireles refused to perform an illegal act, all this testimony shows is that she did not, herself, commit an illegal act. Mireles's testimony is consistent with our analysis that even if the billing department's practices were illegal, Mireles was not asked to nor did she do anything illegal.

Also according to Mireles, she testified that she refused to "engage in IRS prohibited transactions even though Sparenberg directed her to process payments that would be a violation" or "violate the Stark law."

Q: Now, you, yourself, never violated the Stark law; isn't that right?

A: That's correct.

\* \* \*

Q: Now, I think it's your testimony that you were told not to interfere in activities that were going on in other areas at LMG; is that correct?

A: That's correct.

Q: And, again, no one told you that you must do these things that violated the Stark law, but instead they told you just to ignore what's happening; isn't that correct?

A: Can you rephrase that question?

Q: Sure. No one told you that you must do certain things that violated the Stark law, but instead they just told you to ignore what's happening?

A: They told me to ignore what was happening, and they told me that I needed to follow what they were doing and use the information that they provided.

Q: But, again, no one told you that you must do those things that violated the Stark law; isn't that correct?

A: Nobody told me to do billing—no, nobody told me to do billing that violated the Stark law; that's correct.

Q: And no one ever told you that if you didn't engage in activities that violated the Stark law, you would be fired, did they?

A: Oh, yes, they did.

Q: They did?

A: Not in those words, but they did.

Q: Do you recall your deposition testimony, Ms. Mireles? Why don't we take a look and see what you said at your deposition.

(Portion of video played of Ms. Mireles's deposition)

I'm just trying to make sure I'm clear on this, but you've noticed—you're al-

leging there were Stark law violations. I just want to be sure that no one came to you and said, Ms. Mireles, if you don't violate these—if you don't do these practices, that you now allege violate the Stark law, if you don't do these things, you're fired. Did anybody tell you that?

If I don't—

Do these things that you said were illegal that you would be fired?

No, sir.

(video stopped)

Q: Now, no one ordered or required you to engage in IRS to engage in IRS-prohibited transactions, did they?

A: Mr. Sparenberg directed me to process the payments that he wanted, but he did not specifically say, I want you to violate the IRS-prohibited transactions, no. He did not use that language.

Q: Do you remember the question being asked at your deposition as to whether or not you were ordered or required to engage in IRS-prohibited transactions?

A: I remember the question, yes.

Q: And do you recall what your answer was?

A: I'm sure I said nobody did.

Q: And you, yourself, never engaged in IRS-prohibited transactions; isn't that correct?

A: That's correct.

Q: And you never did anything in your position as director of finance for LMG that facilitated or assisted anybody in committing IRS-prohibited transactions; isn't that right?

A: No, that's not right.

Q: Do you recall that question being asked to you during your deposition?

A: Yes, ma'am, and I took a different interpretation of it when I was at the deposition than I do now.

Q: Okay. Why don't we go ahead and look and see what you said under oath at your deposition.

(Portion of video played of Ms. Mireles's deposition)

I understand what you said as far as IRS-prohibited transactions, that you, personally, were not receiving excessive compensation for revenues gained. I understand that. But did you do accounting or bookkeeping or anything in your position as director of finance for LMG that facilitated or helped those others violate the IRS-prohibited transactions?

No, I don't know. No, I don't think so.

No, you don't think so.

No.

(video stopped)

Q: Do you recall that testimony?

A: Yes, ma'am.

Q: And that was under oath, correct?

A: Yes, ma'am.

Mireles does not state that she was ordered to perform an illegal act and she refused. Instead, the evidence only shows that she, personally, did not perform an illegal act.

Mireles also claims that she had a duty to report the information. Mireles fails to cite any support for the proposition that any failure to report the information would result in criminal penalties. *See* Tex.R.App. P. 38.1(h). And, we find no evidence in the record to support such a proposition. Thus, with respect to her various allegations of wrongdoing in the billing department, we hold that there is legally insufficient evidence to support Mireles's *Sabine Pilot* claim.

## B. Perjury

■ Mireles also claims that Volmert asked her to perjure herself in connection with a lawsuit brought by a former employee against two doctors and that she refused. There is legally sufficient evidence of this allegation. Mireles testified that an office manager had "raised some concerns about one of the doctors in the practice to the administration at LMG."[1] According to Mireles, after the office manager raised the concerns, one of the doctors wanted to fire the office manager. Volmert asked Mireles to investigate the accounting practices followed by the office manager at the doctors' office. After Mireles finished her investigation, Volmert asked her whether there were any grounds on which to fire the office manager. Mireles told Volmert that there was nothing wrong with the accounting practices followed by the manager, so Mireles could not recommend that the office manager be terminated. Volmert then told Mireles to say "whenever asked by counsel, that [Mireles] had found some inappropriate accounting practices by the office manager." Volmert asked Mireles to "concoct this story in the lawsuit." Mireles testified that she told Volmert she would not do so.

LMG and Mercy argue that Volmert's alleged request of Mireles to perjure herself and Mireles's refusal do not fit within *Sabine Pilot* because "[i]t is undisputed that Mireles was never called on to testify in the lawsuit brought before the office manager." *Sabine Pilot,* however, only requires a party to refuse to perform an illegal act. Whether one is called to testify is immaterial. Mireles meets *Sabine Pilot's* requirements by refusing to commit perjury when asked by Volmert.

1. Outside the presence of the jury, the lawyers revealed that the office manager had accused

## C. Casteel

■ In Question No. 1, the jury was asked the following question:

Did any of the following Defendants discharge Josefina Mireles for the sole reason that she refused to perform an illegal act?

As used in this question, an "illegal act" means any one or more of the following:

a. Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program;

b. Whoever, in any matter involving a health care benefit program, knowingly and willfully—

1. falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or

2. makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services shall be fined under this title or imprisoned not more than 5 years, or both;

The term "Federal health care program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

one of the doctors of sexually harassing her.

c. Entering into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim; or

d. Whoever, with intent to deceive and with knowledge of the statement's meaning makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath.

A person acts intentionally, or with intent with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The jury answered "yes" to LMG and "yes" to Mercy. LMG and Mercy argue that because there is legally insufficient evidence of subparts (a)-(d), pursuant to *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.2000), we must reverse and remand the case. We have found that there is legally insufficient evidence of subparts (a)-(c), but that there is legally sufficient evidence of subpart (d). Thus, the question is whether *Casteel* requires us to reverse and remand this case when only one subpart is supported by legally sufficient evidence. We believe so.

In *Casteel*, the supreme court held that when "a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389. Although Texas Rule of Civil Procedure 277 states that broad form is clearly the preferred method of submission, "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying rule 277 by avoiding the need for a new trial when the basis for liability cannot be determined." *Id.* at 390.

*Casteel* held that such error is reversible. In *Casteel*, the charge included a single question with a single answer that could have been based on any one of thirteen independent grounds. Of the five DTPA laundry list grounds included, the plaintiff did not satisfy the required consumer status on four of those grounds. Because the jury was not asked separately about each of the plaintiff's thirteen theories of liability, the supreme court concluded that the jury could have based its answer solely on one or more of the erroneously submitted theories. *Id.* at 387–88. "To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds." *Id.* at 388 (emphasis in original).

Since *Casteel*, the supreme court has also concluded that broad-form submission is not feasible for lump-sum damages when any element of the damages has no evidentiary support. In *Harris County v. Smith*, 96 S.W.3d 230 (Tex.2002), the trial court submitted two broad form damages questions, each of which instructed the jury to

consider several elements and award a single lump-sum amount. Harris County objected to the questions and asked the trial court to submit each element separately. *Id.* at 231. After the trial court denied the request for separate submissions, Harris County objected on the ground that one listed element in each question was supported by no evidence. *Id.* at 231–32. The trial court overruled the objections. *Id.* On appeal, the court of appeals concluded there was no evidence of the challenged elements, but held the submission error was harmless "because there was ample evidence on properly submitted elements of damage to support the jury's awards to both plaintiffs." *Id.* at 232. The supreme court reversed, relying on *Casteel* and holding that

> the trial court erred in overruling [the defendant's] timely and specific objection to the charge, which mixed valid and invalid elements of damages in a single broad-form submission, and that such error was harmful because it prevented the appellate court from determining "whether the jury based its verdict on an improperly submitted invalid" element of damage.

*Id.* at 234 (quoting *Casteel,* 22 S.W.3d at 388).

*Casteel* dealt with valid and invalid theories of liability submitted in a broad-form question. *Harris* dealt with the submission of an element of damage that was not supported by legally sufficient evidence. Here, we have multiple liability theories, several of which are not supported by legally sufficient evidence. Although the supreme court has not yet decided whether *Casteel* should apply in this scenario, we believe that the same policy concerns underlying *Casteel* and *Harris* apply here. Three of the four liability theories submitted to the jury were not supported by legally sufficient evidence. And, these three liability theories in question were heavily emphasized and relied on by Mireles. Indeed, reviewing the record, most of the trial concerned subparts (a)-(c) of Question 1; the perjury allegation (subpart (d)) was not nearly as developed or emphasized by Mireles. It is, therefore, "impossible for us to conclude that the jury's answer was not based on one of the improperly submitted theories." *Casteel,* 22 S.W.3d at 389. The jury almost certainly relied on one of more of subparts (a)-(c) in finding LMG and Mercy liable under *Sabine Pilot.* Thus, as in *Casteel,* "[t]o hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds." *Casteel,* 22 S.W.3d at 388 (emphasis in original).

We recognize that the Fort Worth Court of Appeals in *Columbia Medical Center v. Bush,* 122 S.W.3d 835, 858 (Tex.App.-Fort Worth 2003, pet. denied), has reached the opposite result. In *Bush,* the court of appeals held that *Casteel* did not apply because the plaintiff submitted only one theory of liability, negligence. *Id. Bush,* however, is not binding precedent, and we are not required to follow it. Here, Mireles alleged one cause of action, a *Sabine Pilot* claim. However, three of her theories of liability were based on LMG's accounting practices. One was based on perjury. These allegations were completely distinct and based on completely different evidence. We, therefore, cannot hold that the submission of Question 1 was harmless.

## D. Waiver

In response to LMG and Mercy's *Casteel* argument, Mireles argues that they waived *Casteel* by failing to object to the use of the disjunctive "or" in the liabili-

ty question. LMG and Mercy counter that because *Sabine Pilot* refers to "an illegal act," they do not contend that Mireles was required to obtain a finding that her termination resulted from a refusal to violate all four statutes. Thus, according to LMG and Mercy, "[a]n affirmative finding specific to any one of the four statutes would suffice, assuming there was sufficient evidence pertaining to that statute. The flaw in the liability question is not that it required an affirmative finding for only one statute, but that it leaves this Court unable to discern which statute or statutes formed the basis for the jury's answer." We agree. An objection to the "disjunctive" was not required to preserve error under *Casteel*.

■ Under *Casteel* and its progeny, to preserve charge error on broad-form submission, a party must make "[a] timely objection, plainly informing the court that a specific element ... should not be included in a broad-form question because there is no evidence to support its submission." *In re A.V.*, 113 S.W.3d 355, 362–63 (Tex.2003) (alteration in original) (quoting *Harris County*, 96 S.W.3d at 231). LMG and Mercy met this standard. They objected during the charge conference to the submission of a single broad-form liability question. The trial court was fully aware of the problems with submitting a broad-form liability question. *See* Tex.R.App. P. 33.1 (to preserve error for appeal, a party must make the "trial court aware of the complaint, *unless the specific grounds were apparent from the context*"). Here, LMG and Mercy first noted that because there are two defendants in the case, they "wanted to make clear that if there was a finding that there was a termination for refusing to perform illegal acts that it was the same defendant that had instructed [Mireles] to perform those illegal acts." According to LMG and Mercy, "that's

why, in our proposed jury charge, we had separated those into two questions." The judge denied the request, stating that based on what he had read in the Pattern Jury Charges, he did not believe "there was a reason to split them up." LMG and Mercy's counsel then argued that there was no evidence under any of the subparts to Question 1:

> Question Number 1, we believe there's no evidence of any requests of—to actually perform an illegal act of any of these things that are listed here. So we disagree with the predicate, Your Honor, that there was been a request to perform an illegal act by any of the Defendants for these things. There may be bystander liability. I believe Ms. Mireles is saying that she may have observed some—some fraud or observed some—some things, but, again, there has to be a request to perform an illegal act. So we disagree with the submission of any of these illegal acts as stated in Question Number 1.

We hold that LMG and Mercy sufficiently preserved error for appeal. The trial court was aware that LMG and Mercy believed submitting a broad-form question was error, and the trial court was aware that LMG and Mercy believed subparts (a)-(d) should not be submitted because there was no evidence to support them.

We, therefore, sustain LMG and Mercy's issue, reverse the trial court's judgment, and remand the cause to the trial court for further proceedings consistent with this opinion.

## JUDICIAL ADMISSION

### A. Mireles's Testimony

■ Under *Sabine Pilot*, the plaintiff must show that she was fired for no other reason than she refused to commit an illegal act. LMG and Mercy argue that Mi-

reles judicially admitted that she was fired for other reasons than her refusal to commit an illegal act. They point to Mireles's trial testimony in which she testified that LMG and Mercy fired her for complaining about LMG's billing practices. According to LMG and Mercy, Mireles's testimony is a judicial admission, and, as such, her *Sabine Pilot* claim fails as a matter of law.

Mireles's testimony, however, is not a judicial admission; it is a quasi-judicial admission. The supreme court has explained the difference between a quasi-admission and a judicial admission:

A party's testimonial declarations which are contrary to his position are quasi-admissions. They are *merely some evidence,* and they are not conclusive upon the admitter. The weight to be given such admissions is decided by the trier of fact. These are to be distinguished from the true judicial admission which is a formal waiver of proof usually found in pleadings or the stipulations of the parties. A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it.

*Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980) (emphasis added) (citations omitted); *see also TX Far West, Ltd. v. Tex. Invs. Mgmt., Inc.,* 127 S.W.3d 295, 308 (Tex. App.-Austin 2004, no pet.); *Gonzales v. Castill,* No. 04–99–00063–CV, 2000 WL 84537, at *3 (Tex.App.-San Antonio 2000, no pet.).

 A judicial admission is a formal waiver of proof that dispenses with the production of evidence on an issue and bars the admitting party from disputing it. *Lee v. Lee,* 43 S.W.3d 636, 641 (Tex.App.-Fort Worth 2001, no pet.); *Dowelanco v. Benitez,* 4 S.W.3d 866, 871 (Tex.App.-Corpus Christi 1999, no pet.). As long as the statement stands unretracted, it must be taken as true by the court and jury. *Lee,* 43 S.W.3d at 641. It is also binding on the declarant; the declarant cannot introduce evidence to contradict it. *Id.* This rule is based on the public policy that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement. *Id.; Dowelanco,* 4 S.W.3d at 871. The elements required for a judicial admission are: (1) a statement made during the course of a judicial proceeding; (2) that is contrary to an essential fact or defense asserted by the person making the admission; (3) that is deliberate, clear, and unequivocal; (4) that, if given conclusive effect, would be consistent with public policy; and (5) that is not destructive of the opposing party's theory of recovery. *Lee,* 43 S.W.3d at 641–42; *Dowelanco,* 4 S.W.3d at 871.

Here, Mireles testified that she believed that she was terminated because (1) she refused to violate federal laws about billing, etc. and (2) she refused to commit perjury. As a quasi-judicial admission, under *Mendoza,* the jury was free to determine the weight to be given the admission. Moreover, Mireles testified about her *subjective belief,* not facts.

LMG and Mercy rely on *Robinson v. The Devereux Foundation,* No. 14–01–00081–CV, 2002 WL 1315631 (Tex.App.-Houston [14th Dist.] 2002, pet. denied), for the proposition that Mireles's testimony constitutes a judicial admission. *Robinson,* however, does not discuss judicial admissions; it determined that the trial court properly granted summary judgment on the plaintiff's *Sabine Pilot* claim. LMG and Mercy point to the court of appeals's dicta in which the court of appeals notes that in the plaintiff's answers to interrogatories and in her deposition, the plaintiff "herself identified several other reasons for her termination." *Id.* at *2. The court

of appeals, however, did not rely on this fact in affirming the trial court's judgment. Instead, the court of appeals held that the trial court had properly granted summary judgment because the evidence "*conclusively* negate[d] the essential element of [the plaintiff]'s wrongful termination claim that the sole reason for termination was a failure to commit an illegal act." *Id.* at *3 (emphasis added).

> [The plaintiff] asserts that [the defendant] has done no more than raise a fact issue between conflicting claims concerning why [the plaintiff] was terminated, citing *Higginbotham v. Allwaste, Inc.*, 889 S.W.2d 411, 416 (Tex.App.-Houston [14th Dist.] 1994, writ denied) and *Allen v. Powell*, 989 S.W.2d 776, 779 (Tex.App.-Amarillo), *aff'd in part and rev'd in part by Powell Ind., Inc. v. Allen*, 985 S.W.2d 455 (Tex.1998). These cases are distinguishable because here, [the defendant] has conclusively established at least one legitimate reason for terminating [the plaintiff]. Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to produce controverting evidence raising a fact issue. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). [The plaintiff] relies on her affidavit in which she states *her belief* that she was terminated for refusing to commit an illegal act. However, we cannot say that *[the plaintiff]'s subjective belief regarding the "true" reason for her termination, without more, is sufficient to raise a fact issue.* To hold otherwise would permit every wrongful-termination plaintiff to avoid summary judgment regardless of the evidence simply by asserting a belief that he or she was actually terminated for refusing to commit an illegal act.

*Id.* (emphasis added). Thus, not only does *Robinson* not support LMG and Mercy's position that Mireles made a judicial admission, it actually supports the opposite. *Robinson* holds that a plaintiff's *mere subjective belief* is not sufficient evidence to raise a fact issue. Here, Mireles only testified about her subjective belief. We, therefore, hold that Mireles did not make a judicial admission.[2]

## B. Filing Claim with EEOC

■ Shortly after Mireles was fired, she filed a complaint with the EEOC, stating in an affidavit that she believed that she was fired because of her race. LMG and Mercy argue that her filing the complaint with the EEOC is a judicial admission because "an employee who alleges

---

**2.** LMG and Mercy also cite *Robertson v. Bell Helicopter Textron, Inc.*, 863 F.Supp. 346, 354 (N.D.Tex.1993), *aff'd*, 32 F.3d 948 (5th Cir.1994), for the proposition that Mireles made a judicial admission. *Robertson*, however, is also distinguishable. The plaintiff in that case brought both a *qui tam* action and a *Sabine Pilot* claim against his employer. The jury found the defendant liable under the *qui tam* claim, but it never addressed the *Sabine Pilot* claim because under the trial court's instructions, if the jury awarded the plaintiff recovery on his *qui tam* claim, it was precluded from reaching the *Sabine Pilot* claim. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir.1994). The trial court refused to enter judgment in favor of the plaintiff, and instead, granted judgment in favor of the defendant as a matter of law. According to the trial court, the plaintiff was not entitled to a jury determination on his *Sabine Pilot* claim because his *qui tam* claim was inconsistent with his *Sabine Pilot* claim. *Id.* As a result, the trial court dismissed the wrongful discharge claim. The Fifth Circuit affirmed, noting that "to warrant recovery under this narrow common law cause of action, the refusal to perform an illegal act must be the sole reason advanced for the plaintiff's discharge." *Id.* at 953. Here, however, Mireles did not bring inconsistent claims. She only brought a *Sabine Pilot* cause of action, and that was the only cause of action determined by the jury.

wrongful discharge for refusing to perform a criminal act cannot advance additional claims." *Pease v. Pakhoed Corp.,* 980 F.2d 995, 997 n. 1 (5th Cir.1993). However, Mireles did not advance additional claims. She may have filed a complaint with the EEOC, but when she filed her lawsuit, she only brought a *Sabine Pilot* claim. She did not allege a whistleblower claim or a race discrimination claim. Thus, Mireles's simple filing of an EEOC complaint, without more, is not a judicial admission.

### JURY CHARGE FINDING

■ LMG and Mercy also argue that Mireles failed to request or obtain a finding from the jury that she was ordered to commit a crime. A plaintiff must request and obtain a finding on every element of her claim. *See Wal–Mart Stores, Inc. v. Bazan,* 966 S.W.2d 745, 747 (Tex.App.-San Antonio 1998, no pet.). According to LMG and Mercy, because Mireles elected not to request a finding on an essential element of her claim, we must render judgment for LMG and Mercy. *Id.* We disagree.

Question 1 asked: Did any of the following Defendants discharge Josefina Mireles for the sole reason that she refused to perform an illegal act? The jury then answered "yes" with respect to both LMG and Mercy. Implicit in the question is the defendants ordering Mireles to perform an illegal act. Otherwise, at whom is she directing her refusal to perform the illegal act? We overrule this issue.

### CROSS-ISSUE

Because we are sustaining LMG and Mercy's *Casteel* issue, we must reverse the judgment and remand the cause to the trial court for further proceedings consistent with this opinion. Thus, we need not reach the other issues brought by LMG and Mercy. Mireles, however, has brought a cross-point that she only wants

considered if we reverse and remand. Mireles argues in this cross-point, that the "trial court erred in refusing to allow Mireles to submit to the jury questions concerning LMG and Mercy's liability for punitive damages and the appropriate amount of punitive damages to award." We, however, cannot reach this issue as to do so would be an advisory opinion. *See* TEX.R.APP. P. 47.1; *Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex. 2000); *In re D.D.J.,* 136 S.W.3d 305, 315 (Tex.App.-Fort Worth 2004, no pet. h).

### CONCLUSION

We reverse the judgment of the trial court and remand the cause to the trial court for further proceedings consistent with this opinion.