Douglas K. BROCAIL, Appellant,

v.

DETROIT TIGERS, INC., Appellee.

No. 14–06–00557–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 3, 2008.

Rehearing Overruled Sept. 25, 2008.

Bruce E. Ramage, Levon G. Hovnatani-an, Thomas W. Pirtle, Michael Jude Low-enberg, Dale Jefferson, Houston, TX, for appellants.

Jeffrey Stewart Davis, Peter Scaff, Houston, TX, for appellees.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this case, a major league baseball player for the Detroit Tigers (the "Club") sued the Club for injuries to his pitching arm. The Club was granted summary judgment on the grounds, *inter alia,* that the player's claims were barred by the federal Labor–Management Relations Act, the Michigan Workers Disability Compensation Act, and Michigan's statute of frauds. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Douglas Brocail is a professional relief pitcher and a union member of the Major League Baseball Players Association. As such, his employment agreements with major league baseball teams ("Clubs") are subject to a collective bargaining agreement ("CBA") negotiated between the players and the member Clubs. This case concerns alleged acts or omissions that occurred or began during the 2000 baseball season, when Brocail was employed by appellee, the Detroit Tigers, Inc.

### A. The Employment Documents

Pursuant to the terms of the CBA, Players and Clubs are required to execute a specific form of a standard contract (the Uniform Player's Contract or "UPC") when entering into an employment agreement. Under the UPC governing Brocail's employment by the Club, he received a $600,000 signing bonus, a salary of $900,000 for the 2000 season, and a guar-

anteed salary of $2 million for the 2001 season. In section 6(a) of the UPC, the parties agreed that Brocail's contract could be assigned to any other baseball clubs. In section 6(b), Brocail agreed that, "should the Club contemplate an assignment of this contract to another Club or Clubs, the Club's physician may furnish to the physicians and officials of such other Club or Clubs all relevant medical information relating to" Brocail. Brocail further agreed to "accept, abide by and comply with all provisions of the Major League Agreement, the Major League Rules, and the Rules or Regulations of the League of which the Club is a member...."[1] These provisions included League Regulation 2, which provides as follows:

> The Player, when requested by the Club, must submit to a complete physical examination at the expense of the Club, and if necessary to treatment by a regular physician or dentist in good standing.... Disability directly resulting from injury sustained in the course and within the scope of his employment under this contract shall not impair the right of the Player to receive his full salary for the period of such disability or for the season in which the injury was sustained (whichever period is shorter), together with the reasonable medical and hospital expenses incurred by reason of the injury and during the term of this contract or for a period of up to two years from the date of initial treatment for such injury, whichever period is longer, but only upon the express prerequisite conditions that (a) written notice of such injury, including the time, place, cause and nature of the injury, is served upon and received by the Club within twenty days of the sustaining of said injury and (b) the Club shall have the right to designate the doctors and

hospitals furnishing such medical and hospital services. Failure to give such notice shall not impair the rights of the Player, as herein set forth, if the Club has actual knowledge of such injury. All workmen's compensation payments received by the Player as compensation for loss of income for a specific period during which the Club is paying him in full, shall be paid over by the Player to the Club. Any other disability may be ground for suspending or terminating this contract.

The parties also included "Supplemental Agreements" in the UPC, such as the following:

> The Club and the Player covenant that this contract, the Basic Agreement and the Agreement Re Major League Baseball Players Benefit Plan effective April 1, 1996 and applicable supplements thereto fully set forth all understandings and agreements between them, and agree that no other understandings or agreements, whether heretofore or hereafter made, shall be valid, recognizable, or of any effect whatsoever, unless expressly set forth in a new or supplemental contract executed by the Player and the Club (acting by its President or such other officer as shall have been thereunto duly authorized by the President or Board of Directors as evidenced by a certificate filed of record with the League President and Commissioner) and complying with the Major League Rules.

## B. Agreement to Provide Medical Services

The Club represents that under an "Agreement to Provide Medical Services" to the Club, the Henry Ford Center for Athletic Medicine (the "Center") agreed to

---

1. UPC, ¶ 9(a).

select and provide well-qualified medical doctors to act as "team physicians" in exchange for a fixed annual fee.[2] The Center and the Club further agreed that such physicians would remain employees of the Center, and that the "[a]greement is intended solely for the benefit of the Parties hereto and shall not be deemed to create any rights in any other person or entity." The Center designated Dr. Terrence Lock, a board-certified orthopaedic surgeon, to act as one of the team physicians.

## C. Injury and Treatment While Employed by the Tigers

On June 14, 2000 in Detroit, Michigan, Brocail began to complain of pain and inflammation in his right elbow. A follow-up injury report contained the notation that an x-ray performed the same day revealed spurring and new bone formation at the medial epicondyle. Another note entered two days later records that, per Dr. Lock, Brocail had "spurring with inflammation medial epicondyle," but the ligaments and tendons were intact. An injury report also records that Dr. Lock examined Brocail again on June 28, 2000, and Brocail was still tender but "getting better," and physicians would "consider CT if [the pain] persist[ed.]" Brocail was examined and x-rayed again on July 10, 2000.

After pitching on August 18, 2000, Brocail experienced increased medial soreness and mild swelling. He was placed on the disabled list; had additional x-rays on August 21; and was examined by Dr. Failla, another physician employed by the Center, on August 22, 2000. The following day, Brocail sought a second opinion from Dr. James Andrews in Birmingham, Alabama.

The Club paid for Brocail's consultation with Dr. Andrews.

Brocail returned to Michigan, and at the beginning of September 2000, he was removed from the disabled list. After he practiced pitching on September 6 or 7, 2000, he was again restricted from throwing, and additional tests were performed on September 19, 2000.

On September 22, 2000, Dr. Kyle Anderson, another of the Center's physicians, performed arthroscopic surgery on Brocail's elbow. Dr. Anderson noted "very significant spur formation" and removed two loose bone fragments. The sutures were removed on September 29, 2000, and Brocail was placed on the 60–day disabled list. Brocail decided to return to his home in Missouri City, Texas while recuperating from surgery, and he received rehabilitation services in the neighboring city of Sugar Land.[3] He was removed from the disabled list in the first half of November 2000, and on or about December 11, 2000, the Club traded Brocail to the Houston Astros. Brocail's medical bills through December 20, 2000 were paid by the Club's worker's compensation insurance carrier.

## D. Injury and Treatment While Employed by the Astros

On April 4, 2001, Brocail heard a loud pop in his right elbow while pitching in Texas. He played in four more "rehabilitation outings," then consulted Dr. Thomas Mehlhoff in Houston on April 17, 2001. He was diagnosed with a full tear of the medial collateral ligament and a partial tear of the flexor tendon. He subsequently had surgery in Houston to reconstruct the medial collateral ligament. Due to the

---

2. No executed copy of the contract was included in the summary judgment evidence.

3. Brocail had been under contract to the Houston Astros before joining the Detroit Tigers and maintained a permanent residence in Texas.

long recovery time from the surgery, Brocail did not continue to pitch for the Astros. The Astros paid Brocail's 2001 salary, but when his contract expired at the end of that season, it was not renewed. Brocail was not paid a salary for the 2002 and 2003 seasons. According to Brocail, he returned to pitching for the Texas Rangers in 2004.

### E. Brocail's Allegations

On September 20, 2002, Brocail sued his Michigan and Texas health care providers. In addition, he sued the Club for negligence, fraud, fraudulent concealment, fraudulent inducement, negligent misrepresentation, gross negligence, and breach of contract. According to Brocail, the Club "encouraged and/or directed him to seek treatment from team personnel that did not possess the expertise, skill, training, experience, ability, competence and/or knowledge to properly diagnose and treat an elbow injury sustained by a major league baseball pitcher...." Brocail further alleged that the Club encouraged or directed him to undergo treatment that would not cure his injury and failed to (a) establish policies and procedures for the treatment of its players, (b) follow team physicians' orders, (c) fully disclose the true extent of his condition and his fitness to play baseball, (d) use reasonable care to protect his health and investment, (e) fully advise him of the adverse effects of continued medical and rehabilitative treatment, (f) advise him of options concerning his condition, (g) perform appropriate examinations, and (h) advise the Houston Astros of the true extent of his ability to play baseball. In addition, he contended the Club was negligent in hiring team person-

nel. Brocail also pleaded the discovery rule, agency, ostensible agency, agency by estoppel, equitable estoppel, promissory estoppel, vicarious liability, and "intentional torts," and sought punitive damages and attorneys' fees. Finally, he pleaded that:

> [Brocail's] claims are not within the scope of any purportedly applicable worker's compensation laws and are not barred by any exclusive remedy provision therein.... As a professional athlete whose average weekly wage was not less than 200% of the state average weekly wage, Brocail had no right to the recovery of weekly compensation benefits and any exclusive remedy provision does [not] apply. [4]

On January 31, 2003, the trial court dismissed Brocail's claims against the Michigan health care providers for lack of personal jurisdiction. *Brocail v. Anderson,* 132 S.W.3d 552 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Brocail subsequently non-suited his claims against the remaining health care providers.

### F. Summary Judgment

On June 29, 2005, the Club moved for final summary judgment on the following six grounds:

(i) Section 301 of the Labor–Management Relations Act ("LMRA")[5] preempts and bars Brocail's claims because (a) he did not assert his claim within the applicable federal six-month statute of limitations, and (b) he failed to exhaust his remedies under the collective bargaining agreement;

---

**4.** Brocail alleged that "[d]uring the 2000 season, Brocail developed an injury to his pitching elbow while playing for defendant." He further alleged that his "injury occurred in Texas when he was a resident of the State of

Texas, ... and while he was no longer employed by the Defendant."

**5.** 29 U.S.C. §§ 141–87.

(ii) the exclusive-remedy provision of the Michigan Worker's Disability Compensation Act (the "WDCA") bars Brocail's claims;[6]

(iii) Michigan's statute of frauds bars Brocail's claims because the alleged oral promises regarding medical treatment or warranties were not in writing;

(iv) Brocail's promissory estoppel claim fails as a matter of law because (a) any such promise is not sufficiently clear and definite to allow recovery, (b) Brocail could not have reasonably relied upon the alleged promise as a matter of law, and (c) any promissory estoppel claim is not viable in light of the contract between Brocail and the Club;

(v) Brocail's vicarious liability theories fail as a matter of law because (a) the medical providers for whom Brocail contends the Club is vicariously liable are independent contractors, and (b) the purported wrongdoers are within the scope of immunity provided under applicable worker's compensation law; and

(vi) Brocail's "medical fraud" claims fail as a matter of law because (a) Brocail cannot meet the high burden required to show an "intentional act" under Michigan worker's compensation law, (b) Brocail's allegations do not relate to a past or existing fact, (c) his fraud claims are "merely recast medical negligence claims," (d) any alleged misrepresentation could not have caused Brocail injury, and (e) any alleged reliance was unreasonable.

The trial court granted the motion without specifying its grounds. Brocail appeals the judgment regarding his tort claims, but does not appeal the judgment on his claim for breach of contract.

## II. ISSUES PRESENTED

Brocail presents nine issues on appeal, and the parties agree that Michigan substantive law applies.[7] In his first issue, Brocail contends the Club failed to assert in its motion for summary judgment that specific parts of the CBA or UPC required interpretation in order to resolve Brocail's claims. He argues in his second and third issues that no interpretation of any part of the CBA or UPC is required, and no part of either agreement created or precluded the duties that are the bases of his tort claims. In his fourth issue, Brocail contends that the exclusive-remedy provision of the WDCA does not bar damage claims for which it affords no compensation. Brocail argues in his fifth issue that the Club failed to negate the misrepresentation, reliance, and causation elements of his fraud claims. In his sixth issue, Brocail contends that the intentional-conduct exception to the exclusive-remedy provision of the WDCA applies. In his seventh issue, he challenges the Club's assertion that the Michigan statute of frauds bars his claims. He argues in his eighth issue that the Club did not meet its burden to negate Brocail's various liability allegations. Finally, Brocail contends in his ninth issue that the Club's misrepresentations are sufficiently definite to support Brocail's claim for promissory estoppel.

## III. STANDARD OF REVIEW

We analyze a traditional motion for summary judgment under a well-established

***

6. The Club asserted, in the alternative, that Brocail's claims are barred by Texas workers' compensation law.

7. We continue to apply Texas procedural law even when applying the substantive law of another state. *Moonlight Invs., Ltd. v. John*, 192 S.W.3d 890, 894 (Tex.App.-Eastland 2006, pet. denied).

standard of review. The movant bears the burden to show that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). We review the motion and the evidence de novo, taking as true all evidence favorable to the nonmovant, indulging every reasonable inference, and resolving any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). When, as here, the trial court does not specify the grounds on which the judgment is based, we will affirm the judgment if it is correct on any legal theory expressly placed at issue and supported by the evidence. TEX.R. CIV. P. 166a(c) (stating that issues must be "expressly set out in the motion or in an answer or any other response"); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001) (per curiam) (holding that when the grounds for the ruling are not specified, we affirm "if any of the theories advanced are meritorious"); *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) (holding that a summary judgment cannot be affirmed on grounds not expressly set out in the motion or response).

## IV. ANALYSIS

The Club's motion for summary judgment was largely based on the application of (a) preemption under the Labor–Management Relations Act ("LMRA"), (b) the exclusive-remedy provision of the Michigan WDCA, and (c) Michigan's statute of frauds. For the sake of clarity, we group the issues presented on appeal under these headings.

### A. Labor–Management Relations Act

As its first basis for summary judgment, the Club asserted that Brocail's claims

8. 29 U.S.C. §§ 141–87.

9. 29 U.S.C. §§ 141–87. *See DelCostello v. Intl. Bhd. of Teamsters*, 462 U.S. 151, 170–71, 103 S.Ct. 2281, 2293–94, 76 L.Ed.2d 476

were preempted by section 301 of the LMRA,[8] and thus, Brocail is bound by the requirements of that Act, including requirements to exhaust remedies under the applicable collective bargaining agreement and to assert claims within six months.[9] *See* 29 U.S.C. § 185 (codifying section 301 of the LMRA). Brocail contends that his claims are not preempted, and thus, these requirements do not apply. Preemption under the LMRA is a question of law, which we review de novo. *Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 404 (5th Cir.2000).

 Given the importance of maintaining uniform federal law, "the Supreme Court has made clear that § 301 of the LMRA preempts any state-law claim arising from a breach of a collective bargaining agreement." *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir.1989) (en banc). Preemption under section 301 also applies to many tort claims ostensibly asserted under state law. *Id.* at 1329–30 (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 217, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). To survive preemption, tort claims must be "independent" of the CBA. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409–10, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410 (1989); *Allis–Chalmers Corp.*, 471 U.S. at 213, 105 S.Ct. 1904, 85 L.Ed.2d 206 (analyzing state-law claim to determine if it was "independent of any right established by contract, or, instead, whether evaluation of the tort claim [was] inextricably intertwined with consideration of the terms of the labor contract"); *Mattis v. Massman*, 2004 Fed.App. 0003P, 355 F.3d 902, 905 (6th Cir.2004) (same). Thus,

(1983) (assigning such disputes the same limitations period found in the National Labor Relations Act); 29 U.S.C. § 160(b).

the LMRA not only preempts state-law claims that are based directly on rights created by a collective bargaining agreement, but also preempts claims that are "substantially dependent upon analysis of the terms made between the parties in a labor contract...." *Stringer v. Nat'l Football League*, 474 F.Supp.2d 894, 900 (S.D.Ohio 2007) (quoting *Allis–Chalmers Corp.*, 471 U.S. at 220, 105 S.Ct. at 1916). But "neither a tangential relationship to the CBA, nor [a] defendant's assertion of the contract as an affirmative defense [can] turn an otherwise independent claim into a claim dependent on the labor contract." *DeCoe v. Gen. Motors Corp.*, 1994 FED App. 0261P, 32 F.3d 212, 216 (6th Cir.1994).

 Courts follow a two-step approach to determine whether a state-law tort claim is sufficiently "independent" to survive LMRA preemption. First, the court "must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms." [10] Second, the court "must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law." [11] The claim is preempted unless it is created by state law and does not require interpretation of the CBA. [12] If a plaintiff can prove all of the elements of the claim without the need for contract interpretation, then his claim is independent of the labor agreement and is not preempted. [13] But if resolution of the state-law claim is "substantially dependent" on an analysis of the terms of the CBA or "inextricably intertwined" with it, the claim is preempted by the LMRA. [14]

### 1. Asserted as a Basis for Summary Judgment

 In his first issue, Brocail contends that because the Club's motion contains no assertion that any specific part of the CBA or UPC must be interpreted to resolve any of Brocail's claims, the Club did not expressly move for summary judgment on the grounds that Brocail's claims are preempted by the LMRA. Thus, he reasons, summary judgment cannot be affirmed on this basis. The Club responds that Brocail failed to specially except to the motion and therefore waived his complaint that the motion lacked specificity. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex.1993) (plurality op.) ("An exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous."); *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 784 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (special exception is required to preserve complaint that a motion for summary judgment is vague or lacks specificity). The excepting party also must obtain a ruling on the special exception to preserve the issue for appeal. TEX.R.APP. P. 33.1; *Franco*, 154 S.W.3d at 784.

Rather than specially excepting to the alleged omission and thereby giving the Club an opportunity to amend, Brocail challenged the alleged omission substantively. In his response, he asserted that the Club "fail[ed] to identify a single provision of the CBA or UPC that must be

---

**10.** *DeCoe*, 32 F.3d at 216; *accord, Jones v. Roadway Express, Inc.*, 931 F.2d 1086, 1089 (5th Cir.1991) (beginning preemption analysis by examining the elements of the alleged state-law tort).

**11.** *DeCoe*, 32 F.3d at 216.

**12.** *Id.*

**13.** *Id.*

**14.** *Allis–Chalmers Corp.*, 471 U.S. at 220, 105 S.Ct. at 1916.

interpreted to resolve Brocail's tort claims" or "to resolve the factual issues" identified in the motion for summary judgment. According to Brocail's arguments in the trial court, the Club's failure to cite a specific provision of the CBA that requires interpretation demonstrates that no interpretation is necessary to resolve his claims.[15]

We agree with the Club. A special exception was required to preserve Brocail's argument for appeal. Tex.R.App. P. 33.1; *Franco*, 154 S.W.3d at 784. And even if Brocail's argument could be construed as a special exception to the motion's lack of specificity, Brocail identifies no ruling in the record on such an exception. *See* Tex. R.App. P. 33.1(a)(2) (to preserve a complaint for appellate review, the record must show that the trial court implicitly or expressly ruled on the objection, or the complaining party objected to the trial

court's refusal to rule). We therefore conclude that Brocail's appellate argument regarding the Club's failure to cite specific provisions of the CBA is waived, and we overrule Brocail's first issue.[16]

### 2. Need to Interpret Specific Contract Provisions

■ Brocail next contends that the resolution of his tort claims does not require the interpretation of any specific provision of the CBA, the UPC, or the League Regulations. Similarly, he argues in his third issue that these documents did not create or preclude the duties that are the bases of his tort claims. Both arguments are only partially correct.[17]

### a. Claims Based on Duty to Provide Reasonable Medical Care

In support of his argument that his claims arise under Michigan state law and

---

**15.** These arguments seem to rely on the standard governing no-evidence summary judgments, rather than traditional summary judgments. *See Cuyler v. Minns*, 60 S.W.3d 209, 212–13 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (because movant's failure to identify challenged elements of claims renders a no-evidence motion for summary judgment legally insufficient under Rule 166a(i), the nonmovant is not required to object).

**16.** The Club adequately presented the preemption argument in its summary judgment motion.

**17.** Interestingly, each party relies for support on statements by the other's expert or counsel. Contrary to its arguments on appeal, the Club's general counsel previously denied that the duty to provide reasonable medical care "is a right that flows from" the CBA and instead agreed that the Club had a duty under Michigan's workers' compensation statutes to provide reasonable medical care. Brocail also reversed his litigation strategy, and the Club relies in part on a June 8, 2005 report by Brocail's expert, Matthew J. Mitten, in which Mitten opines:

> Read together, the Collective Bargaining Agreement, the UPC, and the Regulations establish that a Major League Baseball

club, such as the Detroit Tigers, effectively has a non-delegable duty to provide reasonable and appropriate medical care to its players, including an obligation to provide proper treatment and rehabilitation for their injuries.

*But see* Matthew J. Mitten, *Team Physicians as Co–Employees: A Prescription that Deprives Professional Athletes of an Adequate Remedy for Sports Medicine Malpractice*, 50 St. Louis U. L.J. 211, 213 (Fall 2005) ("Unless statutorily excluded from coverage, a professional team's players are 'employees' who are entitled to workers' compensation benefits for injuries occurring within the scope of their employment.").

Despite the efforts of both sides to characterize such statements as relevant evidence, the issue of whether claims are preempted by the LMRA is a question of law to be reviewed de novo. *Bartholomew v. AGL Res., Inc.*, 361 F.3d 1333, 1337 (11th Cir.2004); *Meredith*, 209 F.3d at 404; *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 487 (5th Cir.1996); *Quesnel v. Prudential Ins. Co.*, 66 F.3d 8, 11 n. 4 (1st Cir.1995). Thus, our analysis is unaffected by the opinions of these witnesses.

do not require interpretation of the CBA, Brocail relies on the following provision of Michigan's Worker's Disability Compensation Act:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed.

MICH. COMP. LAWS ANN. § 418.315(1). The Club, however, argues that Brocail's claims rely on the Club's alleged breach of a contractually-implied duty to provide medical care, and "[w]ithout reference to and reliance on the CBA, the UPC and the Regulations, the Tigers would have no duty or obligation to provide *any* medical services to Brocail." [18]

We need not look for such an implied duty in these agreements because the parties are bound by express state statutes, and the Club could not "opt out" of Michigan workers' compensation law. *See* MICH. COMP. LAWS ANN. § 418.111 (*"Every employer,* public and private, and every employee, unless herein otherwise specifically provided, shall be subject to the provisions of this act and shall be bound thereby.") (emphasis added). The Club's position is inconsistent with the unambiguous language of section 418.315(1), which requires it to provide reasonable medical care.

Because the determination of the Club's duty and alleged breach of duty to provide Brocail with reasonable medical services can be resolved without reference to the CBA, the UPC, or the Regulations, these claims are not preempted by the LMRA. *See Lingle,* 486 U.S. at 409–10, 108 S.Ct. at 1883 ("[A]s long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."). Thus, Brocail's claims that the Club breached a duty to provide reasonable medical care are not preempted by the LMRA. But as discussed *infra,* these claims—which include Brocail's allegations that the Club (i) encouraged or directed Brocail to seek treatment from unskilled team personnel; (ii) failed to seek determination of proper treatment from a skilled physician; (iii) "failed to use reasonable care with plaintiff"; (iv) failed to use reasonable care to protect plaintiff's health; and (v) failed to perform the appropriate examinations to determine his pre-participation or qualifying status, identify future risk of injury, determine his fitness to play baseball, prevent subsequent injury, and assess his rehabilitative status—are barred by the WDCA.

Some of Brocail's claims, however, are not based on the duty to provide reasonable medical care. And as discussed below, we reach a different result concerning the preemption of claims arising from the alleged violation of duties found only in the CBA.

**b. Claims Based on Express Contractual Duties**

■ Brocail contends that the Club "failed to provide a proper second opinion before encouraging, endorsing or directing Brocail to undergo treatment...." But Brocail points to no authority in Michigan

---

**18.** In support of this argument, the Club cites *International Brotherhood of Electrical Workers v. Hechler,* 481 U.S. 851, 862, 107 S.Ct. 2161, 2168, 95 L.Ed.2d 791 (1987) (concluding that it was necessary to interpret a collective bargaining agreement to determine the existence and scope of union's implied duty to ensure a safe workplace). In *Hechler,* however, the plaintiff's claim expressly was based on alleged breaches of "contracts and agreements" and not on the breach of a state statute expressly imposing a duty on the employer.

law that required the Club to "provide a proper second opinion," nor have we found such a requirement.[19] To the contrary, the only basis on which to imply a duty to provide a second medical opinion is found in the CBA.

Article XIII, section D of the CBA is entitled "Second Medical Opinion" and provides as follows:

> Within 20 days following the execution of this Agreement, the Clubs will provide an updated, accepted listing of medical specialists, by specialty and by geographic regions, to whom Players may upon their request go for diagnosis and a second medical evaluation of an employment[-]related illness or injury being treated by the Club physician. At least two physicians will be designated for each specialty in each region. Further, the Association and the Clubs shall promptly agree on appropriate procedures by which this listing of medical specialists will be updated annually. A Player may seek a "second evaluation" from a medical specialist on the accepted listing who is located outside the geographic region within which the Player's Club is located, provided that the Player is not absent from the Club for an unreasonable time.

Thus, to determine whether the Club was required to provide a second opinion and to define the meaning of a "proper second opinion," it is necessary to interpret the CBA. Consequently, this claim is preempted by the LMRA. We therefore overrule Brocail's second and third issues as they pertain to any duty of the Club concerning a "second opinion."

We reach a similar result regarding Brocail's claims arising from his trade to the Houston Astros. Because the CBA governs assignment of his contract, Brocail's claim that the Club fraudulently induced him to enter a contract with the Astros is preempted. *See Burgos v. Sw. Bell. Tel. Co.,* 20 F.3d 633, 636 (5th Cir. 1994) ("In order to determine whether Southwestern Bell acted wrongfully in the way it transferred [the employee] from one section to another, required him to take different tests, and ultimately effectuated his termination, an analysis of Southwestern Bell's obligations under the collective bargaining agreement is necessary."). In particular, it is necessary to interpret the CBA to determine whether Brocail's consent to the assignment was necessary, and whether reliance on any representation by the Club concerning assignment of his contract was reasonable in light of the CBA.[20] *See Feitl v. Los Angeles Clippers,* 48 F.3d 1227, 1995 WL 100596, at *3 (9th Cir. March 8, 1995) (unpublished mem. op.) ("Because Feitl knew at the time of the alleged fraud that any employment he might have with LAC was governed by a CBA, Feitl must prove that his reliance was *justified in light of the CBA.*") (citing *Milne Employees Ass'n v. Sun Carriers, Inc.,* 960 F.2d 1401, 1408–09 (9th Cir. 1991)). Thus, we overrule Brocail's second and third issues as they pertain to his claim of fraudulent inducement.

## B. Michigan Worker's Disability Compensation Act

Under Michigan law, "[e]very employer, public and private, and every em-

---

19. *Cf.* Mich. Comp. Laws Ann. § 418.315(1) ("After 10 days from the inception of medical care as provided in this section, the employee may treat with a physician of his or her own choice by giving to the employer the name of the physician and his or her intention to treat with the physician.").

20. The CBA contains provisions addressing circumstances in which assignment is prohibited or which require the Player's consent.

ployee, unless ... otherwise specifically provided [in the WDCA], shall be subject to the provisions of this act and shall be bound thereby." MICH. COMP. LAWS ANN. § 418.111. The WDCA applies to all private, non-agricultural employers who regularly employ three or more employees at one time, excluding family members employed as domestic servants. *See id.* §§ 418.115(a); 418.118(1). In addition, any private employer who purchases and accepts a valid workers' compensation insurance policy, except in the case of domestics and agricultural employees, assumes "the liability for compensation and benefits imposed by this act upon employers." *Id.* § 418.121.

The parties do not dispute that the Club had a valid worker's compensation insurance policy in effect at the time of Brocail's injury, and that medical benefits were paid pursuant to that policy. Thus, the Club is an employer subject to the WDCA. *See id.* §§ 418.111, 418.121. In addition, Brocail is an employee as that term is used in the Act:

(1) As used in this act, "employee" means:

. . .

(*l* ) Every person in the service of another, under any contract of hire, express or implied. . . .

. . .

(n) Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury, if the person in relation to this service does not maintain a separate business, does not hold himself or herself out to and render service to the public, and is not an employer subject to this act.

*Id.* § 418.161. The WDCA further provides:

The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge. The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under the law.

*Id.* § 418.131(1). Here, Brocail seeks to recover for a personal injury sustained in the course and scope of his employment. Thus, with the exception of intentional torts as described above, the WDCA affords his only remedy.

### 1. Uncompensated Loss of Earnings

■■■ To avoid the exclusive-remedy provision, Brocail points out that section 418.360 of the WDCA bars his receipt of weekly earnings benefits otherwise available under the act:

(1) A person who suffers an injury arising out of and in the course of employment as a professional athlete shall be entitled to weekly benefits only when the person's average weekly wages in all employments at the time of application for benefits, and thereafter, as computed in accordance with section 371, are less than 200% of the state average weekly wage.

(2) This section shall not be construed to prohibit an otherwise eligible person from receiving benefits under section 315,[21] 319,[22] or 361.[23]

*Id.* § 418.360 (internal footnotes referencing prior laws omitted). Thus, Brocail reasons, the exclusive-remedy provision of the WDCA does not apply to his claim for earnings-related damages. Stated differently, he argues that section 418.360(1) provides an exception to the exclusive-remedy provision of section 418.131(1).

In support of this argument, Brocail relies on *Eversman v. Concrete Cutting & Breaking, Inc.*, in which the Michigan Supreme Court explained:

The primary purpose of the worker's compensation act is to provide benefits to the victims of work-related injuries by allocating the burden of these payments to the employer, and, therefore, ultimately, to consumers. An employee who suffers an injury arising out of and in the course of his employment will be eligible for compensation regardless of whether the employer was at fault. In return, the employer is immunized from tort liability because the worker's compensation act, under [section] 418.131(1) ... provides that this compensation is the exclusive remedy for a personal injury, except for an injury resulting from an intentional tort.

463 Mich. 86, 92–93, 614 N.W.2d 862, 864 (2000) (citations omitted). Because an employer is immunized for tort liability by paying the worker "compensation" for a work-related injury, Brocail contends that the reverse must also be true; thus, he argues, if the employee does not receive "compensation" for lost earnings, then the employer is not immunized from tort liability for those damages. He argues that "[c]ourts across the country have confirmed that exclusive[-]remedy provisions apply only to damages that are compensable under a worker's compensation statute."

### a. *Haddad v. Justice*

In support of this position, Brocail first relies on *Haddad v. Justice*, in which the Michigan Court of Appeals wrote:

Plaintiffs' complaint contained a claim for property damage and the wife's claim for loss of consortium. As to the wife's claim for loss of consortium, it is barred by [section] 418.131.... We find that there is no provision in the Workmen's Compensation Act applicable to plaintiffs' claim for property damage, and, as to it, accelerated judgment was improper.

64 Mich.App. 74, 77, 235 N.W.2d 159, 160–61 (1975).

---

**21.** Section 418.315 provides, *inter alia,* that:

The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed.... After 10 days from the inception of medical care as provided in this section, the employee may treat with a physician of his or her own choice by giving to the employer the name of the physician and his or her intention to treat with the physician.

**22.** Under this section:

An employee who has suffered an injury covered by this act shall be entitled to prompt medical rehabilitation services. When as a result of the injury he or she is unable to perform work for which he or she has previous training or experience, the employee shall be entitled to such vocational rehabilitation services, including retraining and job placement, as may be reasonably necessary to restore him or her to useful employment.

**23.** This section governs compensation for scheduled losses.

But *Haddad* does not support Brocail's argument. For example, the WDCA provides no compensation for loss of consortium; nevertheless, the *Haddad* court applied the exclusive-remedy provision to this derivative claim.

Brocail responds that the loss of consortium claim in *Haddad* was not covered because claims under the WDCA are personal. But this proposition is not supported by the language of the Act. *See* MICH. COMP. LAWS ANN. § 418.131(2) ("As used in this section ..., 'employee' includes the person injured, his or her personal representatives, *and any other person to whom a claim accrues by reason of the injury to, or death of, the employee ....*") (emphasis added). Thus, the exclusive-remedy provision also applies to anyone to whom a claim accrues as a result of the employee's injury or death.

Significantly, the identification of persons to whom the Act applies is based on the injury, not the compensation provided. Regarding the property-damage claim in *Haddad,* section 418.131 provides that the "right to recovery of *benefits as provided in this act* shall be the employee's exclusive remedy against the employer *for a personal injury or occupational disease.*" *Id.* § 418.131(1) (emphasis added). Because the plaintiff's claim for property damage was not derived from the worker's claim of personal injury or disease, it was neither covered nor barred by the WDCA. But *Haddad* does not stand for the proposition that the exclusive-remedy provision is inapplicable to claims arising from an employee's injury simply because the Act provides no compensation for the particular category of damages sought.

**b. Sole Exception to the Exclusive-Remedy Provision**

Contrary to Brocail's arguments, intentional torts are the "only exception" to the exclusive-remedy rule.[24] Under Michigan law, the applicability of the workers' compensation act is not determined by whether the claimant is fully compensated for a particular category of damages, because "benefits provided by existing compensation acts are not expected to be full payment for all losses suffered."[25] Instead, it is "a fundamental tenet of workers' compensation statutes that if an *injury* falls within the coverage of the compensation law, such compensation shall be the employee's only remedy against the employer...." *Reed v. Yackell,* 473 Mich. 520, 530, 703 N.W.2d 1, 6–7 (2005) (emphasis added) (quoting *Farrell v. Dearborn Mfg. Co.,* 416 Mich. 267, 274–75, 330 N.W.2d 397, 399 (1982)); *see also Downie,* 122 Mich.App. at 737, 333 N.W.2d at 535 ("When an employee's injury is within the scope of the Worker's Disability Compensation Act, workers' compensation benefits are the employee's exclusive remedy against the employer."); *McKinley v. Holiday Inn,* 115 Mich.App. 160, 163, 320 N.W.2d 329, 331 (1982) (per curiam) ("If the WDCA covers the kind of injury suffered, the act['s] remedy is exclusive even though under the facts of the particular case no compensation is payable because there has been no actual loss of earning capacity."). And although Michigan WDCA benefits do not include

**24.** MICH. COMP. LAWS ANN. § 418.131; *Bell v. Ren–Pharm, Inc.,* 269 Mich.App. 464, 466, 713 N.W.2d 285, 286 (2006); *see also Downie v. Kent Prods.,* 122 Mich.App. 722, 738, 333 N.W.2d 528, 536 (1983) (stating that "the exclusive remedy provision of the act bars any common law tort cause of action by an employee against his employer"), *aff'd in part and rev'd in part,* 420 Mich. 197, 362 N.W.2d 605 (1984), *amended,* 421 Mich. 1202, 367 N.W.2d 831 (1985).

**25.** *Franges v. Gen. Motors Corp.,* 404 Mich. 590, 612, 274 N.W.2d 392, 399 (1979).

weekly wage compensation for a professional athlete with a salary as large as Brocail's, wage compensation is not the only "benefit" provided by the WDCA. Highly compensated athletes remain eligible for benefits such as reasonable medical care, medical and vocational rehabilitation, and compensation for scheduled losses. *See* MICH. COMP. LAWS ANN. § 418.360(2).

■ Michigan's laws of statutory construction also prevent us from accepting Brocail's interpretation of the WDCA. *See Echelon Homes, L.L.C. v. Carter Lumber Co.*, 472 Mich. 192, 196, 694 N.W.2d 544, 547 (2005) ("We begin by examining the plain language of the statute; where that language is unambiguous, we presume that the Legislature intended the meaning clearly expressed-no further judicial construction is required *or permitted*, and the statute must be enforced as written.") (emphasis added, citations omitted). As the *Haddad* court emphasized, "Liberal construction [of the Act] applies whether the employee is seeking benefits under the act or resisting application of the exclusive remedy provisions of the act to his cause of action." *Haddad*, 64 Mich.App. at 77, 235 N.W.2d at 160.

Our analysis is unaffected by the cases from other jurisdictions cited by Brocail. *See, e.g., Ivey v. N.C. Prison Dep't*, 252 N.C. 615, 114 S.E.2d 812 (1960); *Davis v. Pioneer, Inc.*, 834 So.2d 739 (Miss.Ct.App. 2003); *Superb Carpet Mills, Inc. v. Thomason*, 183 Ga.App. 554, 359 S.E.2d 370 (1987). The *Ivey* case concerned North Carolina statutes and exceptions that apply only to prisoners. *Ivey*, 252 N.C. at 619, 114 S.E.2d at 815. The *Davis* court held that, under Mississippi law, "where an injury is caused by the *willful act* of an employee acting in the course and scope of his employment and in the furtherance of his employer's business, the Workmen's

Compensation Act is not the exclusive remedy available to the injured party...." 834 So.2d at 741 (emphasis added) (quoting *Miller v. McRae's, Inc.*, 444 So.2d 368, 371 (Miss.1984)). The Michigan WDCA similarly contains an express exception to the exclusive-remedy provision "when an employee is injured as a result of a *deliberate act* of the employer and the employer specifically intended an injury." MICH. COMP. LAWS ANN. § 418.131(1) (emphasis added). And as in *Haddad*, the court in *Superb Carpet Mills* held that "[t]he benefits conferred by the Act relate to damages for personal injury and not property damage." *Superb Carpet Mills, Inc.*, 183 Ga.App. at 555, 359 S.E.2d at 371. None of these cases support Brocail's argument that professional athletes who are paid at least 200% of the state's average weekly wage are exempt from the exclusive-remedy provision of the WDCA.

#### c. Application to Brocail's Causes of Action

Because we must apply the exclusive-remedy provision of the WDCA in accordance with its unambiguous meaning, we overrule Brocail's fourth issue. We affirm summary judgment as to all causes of action pleaded by Brocail other than allegations of an "intentional tort" as defined by section 418.131(1) of the WDCA. *See Eversman*, 463 Mich. at 92–93, 614 N.W.2d at 864; *Am. Bumper & Mfg. Co. v. Nat'l Union Fire Ins. Co.*, 261 Mich.App. 367, 370 n. 3, 683 N.W.2d 161, 162 n. 3 (2004) (noting that any pleaded cause of action that does not include allegations of intentional conduct is barred by the exclusive-remedy provision of the WDCA). Consequently, we hold that Brocail's negligence claims are barred by the Michigan Workers' Compensation Disability Act. *See Harris v. Vernier*, 242 Mich.App. 306, 316, 617 N.W.2d 764, 770 (2000) ("Michigan has long recognized that actions for injuries

incurred as a result of a coemployee's negligence and arising out of the scope of employment are barred by the exclusive[-]remedy provision [of the WDCA].''); *cf. Great Am. Ins. Co. v. Queen,* 410 Mich. 73, 89, 300 N.W.2d 895, 897 (1980) ("An employee's common-law right to proceed in tort against persons *other than his employer or co-workers* was not altered by the worker's compensation act.") (emphasis added).

■ The exclusive-remedy provision also bars those claims that merely restate Brocail's negligence and medical negligence or malpractice claims. *See Jones v. Bouza,* 381 Mich. 299, 302, 160 N.W.2d 881, 882 (1968) (en banc) ("If the [medical] malpractice of a fellow employee, no less than any other negligence of a fellow employee, gives rise to a compensable injury, then workmen's compensation stands as the sole recourse."). The statute similarly bars his claims based on actual agency, ostensible agency, or vicarious liability for the acts of non-employee health care providers. If the tortfeasor was acting as an employee over whom the Club exercised control, then the WDCA bars the claim. *See* MICH. COMP. LAWS ANN. § 418.131. If the tortfeasor was an independent contractor over whom the Club lacked control, then the Club also is not vicariously liable. *See Janice v. Hondzinski,* 176 Mich.App. 49, 53, 439 N.W.2d 276, 278 (1989). Brocail's agency and ostensible agency theories fail for the same reasons. *See Decker v. Saini,* No. 88–361768 NH, 1991 WL 277590, at *2–4 (Mich.Cir.Ct. Sept.17, 1991) (unpublished) (holding HMO liable for acts of physician because, although HMO was a health care insurer and not a health care provider, the patient reasonably believed, based on the HMO's representations, that the HMO was the physician's agent, and patient looked to the HMO for treatment and not just for payment).

Under any of these theories, Brocail cannot prevail on his negligence claims against the Club. *See Bayless v. Philadelphia Nat'l League Club,* 472 F.Supp. 625, 630 (D.C.Pa.1979) (holding that professional baseball player "clearly placed himself within the ambit of the Workmen's Compensation Act ... in that he avers 1) the defendant-employer's assumption of a duty to provide proper medical care; 2) the failure to provide that care; and 3) resultant harm."), *aff'd,* 615 F.2d 1352 (3d Cir. 1980). Thus, we overrule Brocail's eighth issue as well as his fourth issue.

**2. Intentional Torts Exempted from the WDCA's Exclusive–Remedy Provision**

■ The determination of whether a plaintiff has alleged facts constituting a claim for intentional torts is a question of law for the court, although the question of whether the allegations are true is an issue for the jury. *Travis v. Dreis & Krump Mfg. Co.,* 453 Mich. 149, 154, 551 N.W.2d 132, 135 (1996). Under Michigan law, an intentional tort for WDCA purposes occurs only when an employee is injured as a result of a deliberate act of the employer, and the employer specifically intended an injury. *Id.* at 169, 551 N.W.2d at 141. An employer is deemed to have intended to injure if he had actual knowledge that an injury was certain to occur and wilfully disregarded that knowledge. *Id.* at 171, 551 N.W.2d at 142. Knowledge must be actual; constructive, implied, or imputed knowledge is not sufficient. *Id.* at 173, 551 N.W.2d at 143. "A plaintiff may establish a corporate employer's actual knowledge by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." *Id.* at 173–74, 551 N.W.2d at 143.

Here, Brocail pleaded that the Club "had actual knowledge that an injury to Brocail was certain to occur and willfully disregarded that knowledge." In its traditional motion for summary judgment, the Club asserted that the intentional-tort exception did not apply because (a) the Club is not a medical service provider and did not diagnose or operate on Brocail, (b) the Club had no intention of trading Brocail before the surgery, and (c) a member of the Club's front office is the son of a member of the Astros's front office. None of these grounds defeats or avoids any of the elements of an "intentional tort" as defined by the WDCA.

The Club contends that because Brocail did not attach evidence to his summary judgment response to controvert the Club's evidence, "Brocail failed to raise a genuine issue of material fact regarding his (1) counter-affirmative defense of 'intentional torts' under the Michigan Worker's Disability Compensation Act; (2) his fraud claim; and (3) his vicarious liability and agency claims."[26] In support of this argument, the Club relies on cases addressing counter-defenses that had not been previously asserted by the non-movant. *See, e.g., Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam) (plaintiffs raised affirmative counter-defenses in response to defendant's motion for summary judgment). Here, however, Brocail specifically asserted the counter-defenses at issue. Thus, as the movant, the Club was required to disprove the pleaded counter-defenses in order to establish its entitlement to judgment as a matter of law.

In sum, the Club failed to conclusively disprove the factual allegations made in connection with Brocail's claims of "intentional torts." But although we agree in part with the argument presented in Brocail's sixth issue, his "intentional tort" allegations nevertheless fail because they are barred by the Michigan statute of frauds.

### C. Michigan Statute of Frauds

■ In its motion for summary judgment, the Club also argued that Brocail's claims were barred by the Michigan statute of frauds, which provides:

(1) In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:

. . .

(g) An agreement, promise, contract, or warranty of cure relating to medical care or treatment. This subdivision does not affect the right to sue for malpractice or negligence.

MICH. COMP. LAWS ANN. § 566.132(1)(g). The statute does not apply solely to a promise to cure, but applies also to a promise to provide medical care with due care or in a non-negligent manner or to any promise relating to medical care.[27]

---

**26.** Appellee's Brief, at 9.

**27.** *Smith v. City of Pontiac,* 169 Mich.App. 559, 562, 426 N.W.2d 704, 706 (1988) (per curiam). In *Smith,* the plaintiff brought a wrongful death action against the defendant arising out of a decedent's treatment at the defendant's hospital. *Id.* The plaintiff alleged that the defendant was negligent and breached an implied contract to provide medical services, including express and implied warranties to exercise due care in treating the decedent. *Id.* The court held that the plaintiff's contract claim was invalid because the plaintiff admitted there was no written agreement that met the statute of frauds require-

In his Third Amended Petition, Brocail alleged that the Club negligently "represented that Brocail would be as good as new and would pitch again soon for the team if he underwent the treatment by team personnel" but nevertheless failed "to use reasonable care to protect plaintiff's health. . . ." Brocail further alleged that the Club committed fraud and fraudulent concealment by:

> falsely representing that the treatment rendered by team personnel would cure Brocail's injury; falsely representing the nature and outcome of the treatment; falsely representing that the treatment rendered by team personnel was proper and necessary; . . . falsely representing that Brocail would be as good as new and would pitch again soon for the team if he had the treatment.

Brocail made similar allegations in connection with his claims of fraudulent inducement, negligent misrepresentation, gross negligence, breach of contract, and promissory estoppel.

These representations all relate to medical care and treatment; thus, the representations are unenforceable in the absence of a writing. *See Powers*, 183 Mich. App. at 554, 455 N.W.2d at 373 (rejecting "plaintiff's promissory estoppel claim as

the alleged promise made by defendant hospital's nursing staff related to medical care or treatment and such promises must be in writing"); *see also Malik v. William Beaumont Hosp.*, 168 Mich.App. 159, 171–72, 423 N.W.2d 920, 925 (1988) (per curiam) (applying statute of frauds to claim that hospital falsely represented that kidney transplant would improve quality of life). Consequently, the statute of frauds bars claims that Brocail reasonably relied on the Club's "promise" that he would be cured or would pitch again soon if he submitted to a particular course of medical treatment.[28]

 The same reasoning applies to Brocail's claims of fraudulent concealment. Fraudulent concealment, also known as fraud by nondisclosure or "silent fraud," cannot occur in the absence of a legal duty of disclosure. *M & D, Inc. v. W.B. McConkey*, 231 Mich.App. 22, 29, 585 N.W.2d 33, 37 (1998). But in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure. *Id.* at 32, 585 N.W.2d at 39. "[T]he touchstone of liability for misdirection or 'silent fraud' is that *some* form of representation has been made and

ment. *Id.*; *see also Powers v. Peoples Cmty. Hosp. Authority*, 183 Mich.App. 550, 554, 455 N.W.2d 371, 373 (1990) (stating that "the statute requires a writing for any agreement, promise or contract *relating to medical care or treatment* as well as any warranty of cure" and affirming dismissal of plaintiff's contract and promissory estoppel claims) (emphasis added); *Virk v. Detroit Receiving Hosp.*, No. 180621, 1996 WL 33348748, at *1 (Mich.Ct. App. Oct.25, 1996) (per curiam, unpublished) (claimant cannot recover under an alternate theory of promissory estoppel if the claim is barred by section 566.132(1)(g)).

**28.** Brocail argues that his claims fall within an exception stated in the last sentence of section 566.132(1)(g): "This subdivision does

not affect the right to sue for malpractice or negligence." But regardless of whether section 566.132(1)(g) affects the right to sue for malpractice or negligence, the WDCA *does* affect that ability, as discussed *supra*. Because the WDCA bars such suits if brought by an employee against his employer for injuries received in the course and scope of his employment, we need not consider whether the statute of frauds acts as an additional bar to those claims. Instead, we need consider the Michigan statute of frauds only in connection with any of Brocail's surviving claims for intentional torts, and the language on which Brocail relies contains no exception for intentional torts.

that it was or proved to be false." *Id.* at 30, 585 N.W.2d at 38. Although the misrepresentation may be made through words or conduct,[29] the plaintiff's reliance must have been reasonable.[30] But under Michigan law, such reliance on an unwritten representation could not be considered reasonable in light of the statute of frauds. *See Malik,* 168 Mich.App. at 172–73, 423 N.W.2d at 926 (denying claim for promissory estoppel because "it is common knowledge that the results of medical treatment cannot be guaranteed...").

Finally, Brocail argues that this statute applies only to causes of action styled as claims for breach of contract. This argument elevates form over substance: his claim that the Club fraudulently induced him to undergo treatment by misrepresenting that he would be cured is based on a promise of cure, and is therefore barred by the statute of frauds.

We conclude that Michigan's statute of frauds bars Brocail's claims based on representations relating to medical care and treatment. We therefore overrule Brocail's fifth, seventh, and ninth issues.

## IV. CONCLUSION

In summary, we overrule Brocail's first issue challenging the specificity of the Club's assertion of the Labor–Management Relations Act as a basis for summary judgment. We further hold that the duty to provide reasonable medical care arises independently from the collective-bargaining agreement. Because that obligation is imposed by the Michigan Workers' Compensation Disability Act, Brocail's claims arising from an alleged breach of the duty to provide reasonable medical care are not preempted by the LMRA. On the other hand, Brocail's claims of fraudulent induce-

ment and failure to provide a proper second opinion are preempted by the LMRA; thus, we overrule Brocail's second and third issues concerning such claims.

Brocail pleaded that those who performed the medical services at issue were "team personnel," Club trainers, agents, or independent contractors under the Club's control. In effect, he complains that his injuries are attributable to a co-employee. Thus, the WDCA is Brocail's exclusive remedy for any injury not caused by an "intentional tort" as that phrase is defined under the Michigan WDCA. Accordingly, we overrule Brocail's fourth and eighth issues. And because claims arising from representations concerning Brocail's medical care and treatment are barred by Michigan's statute of frauds, we overrule his fifth, seventh, and ninth issues.

Finally, although the Club failed to conclusively disprove the factual allegations made in connection with Brocail's "intentional tort" claims, the claims to which Brocail attempted to apply this exception are barred by the LMRA or the Michigan statute of frauds. Thus, we overrule his sixth issue. There being no remaining claims, we affirm the judgment of the trial court.

---

**29.** *Id.* at 33–34, 585 N.W.2d at 40.

**30.** *Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App. 675, 689–91, 599 N.W.2d 546, 553–54 (1999).